UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** ) ) ) ) **Plaintiff,** ) ) v. ) ) **EARL D. MILLER,** ) **5 STAR COMMERCIAL, LLC, and** ) **5 STAR CAPITAL FUND, LLC,** ) ) **Defendants.** ) ) | Case No. 15-cv- |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows:

1. This case centers on material misrepresentations made to investors – and a fraudulent scheme perpetrated – by Defendant Earl D. Miller and two private investment vehicles that he controlled, 5 Star Commercial, LLC ("5 Star Commercial") and 5 Star Capital Fund, LLC ("5 Star Capital").

2. Miller has been in the business of real estate development and sales since 2006. Starting in 2008 – despite having no experience in managing private investment funds – Miller started recruiting investors for a number of private investment entities that he created. Those private investment entities, in turn, were supposed to generate a return by investing in the building and/or rehabilitating of residential real estate (Miller's "Real Estate Entities").

3. In approximately 2012, Miller started raising money for a new private investment fund – 5 Star Commercial. As with his other Real Estate entities, 5 Star Commercial was supposed to invest investors' money in various real estate projects. Miller gained sole control of 5 Star Commercial in July 2014, and continued to solicit investor funds. In February 2015, Miller branched out and created 5 Star Capital which was supposed to invest in "green energy saving product (sic) that save the average American consumer hundreds of dollars each year."

4. Miller recruited investors for 5 Star Commercial, 5 Star Capital and his other Real Estate entities from a network of predominantly novice investors, including members of the local Amish community.

5. Miller has been enormously successful in exploiting this investor network. From at least July 29, 2014 to the present, he has raised at least $3.9 million from at least 70 investors for his 5 Star Commercial and 5 Star Capital entities.

6. But, in raising those funds, Miller repeatedly lied to prospective investors. Through 5 Star Commercial, Miller lied to prospective investors in two critical instances. First, he falsely told investors that he would not get paid anything for managing the fund when, in reality, he misappropriated over $1 million from 5 Star Commercial investors for his personal use and to pay off a former business partner. Second, Miller and 5 Star Commercial informed investors that their money would be invested exclusively in real estate when, in reality, he invested and/or transferred over $391,000 of 5 Star Commercial's funds into highly speculative, fledgling companies that purportedly made and marketed "green products."

7. Miller similarly defrauded prospective investors in 5 Star Capital – the fund that actually was supposed to invest in the purported "green" companies. Miller (a) told investors that 5 Star Capital owned patents on many of the "green" products that he would be investing in, (b) assured investors that he would "manage risks" on behalf of 5 Star Capital, and (c) orally represented to at least one investor in 5 Star Capital that their money would be invested in real estate (just like Miller's other entities).

8. None of those representations was true. In reality, 5 Star Capital owned no "green product" patents, Miller performed virtually no due diligence into the purported "green" companies before handing them the lion's share of 5 Star Capital's assets, and – contrary to his oral representations to certain investors – the overwhelming majority of 5 Star Capital's assets were not invested in real estate.

9. By making material misrepresentations and omissions to their investors, Miller, 5 Star Commercial and 5 Star Capital have committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5] and Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)].

10. 5 Star Commercial and 5 Star Capital benefited from defrauding their investors. By recruiting investors through fraudulent offering materials, they raised $2.28 million and $1.62 million respectively between July 29, 2014 and the present.

11. In addition, Miller personally benefitted from defrauding investors in 5 Star Commercial. Specifically, from July 29, 2014 to July 1, 2015, Miller has taken at least $1 million from 5 Star Commercial and used it to pay himself and to pay off a personal debt to a former business partner.

12. The SEC brings this lawsuit to halt Defendants' ongoing violations of the federal securities laws, to prevent further harm to investors, and to seek disgorgement and civil penalties stemming from Defendants' wrongdoing, among other remedies.

## JURISDICTION AND VENUE

13. The SEC brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§78u(d) and 78u(e)].

14. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

15. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Many of the acts, practices and courses of business constituting the violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Indiana.

16. Defendants reside and conduct business within the Northern District of Indiana.

17. Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

18. **Earl D. Miller**, age 36, is a resident of Goshen, Indiana. He has been the manager of 5 Star Commercial since 2012 and gained sole control in July 2014. Miller also is the founder and manager of 5 Star Capital. In January 2014, the State of Indiana Securities Division filed a complaint against Miller for selling over $1 million in

4

unregistered securities in another 5 Star entity, 5 Star Investment Group, LLC. Miller entered into a consent agreement with the State of Indiana in April 2015 and agreed to pay a civil penalty of $5,000. Miller controls the day-to-day operations of – and has sole control over the investment decisions for – both 5 Star Commercial and 5 Star Capital.

19. **5 Star Commercial, LLC**, is an Indiana limited liability company, with its principal place of business in Mishawaka, Indiana. 5 Star Commercial purports to be in the business of investing in real estate. To date, it has raised at least $2.28 million from at least 45 investors in six states. The offer and sale of investment interests in 5 Star Commercial were not registered under Section 5 of the Securities Act; instead, they were purportedly offered and sold pursuant to a registration exemption under Securities Act Regulation D.

20. **5 Star Capital Fund, LLC**, is an Indiana limited liability company, with its principal place of business in Mishawaka, Indiana. 5 Star Capital purports to be an unregistered private investment fund that issues promissory notes to investors. To date, it has raised at least $1.62 million from at least 27 investors in three states. The offer and sale of investment interests in 5 Star Capital were not registered under Section 5 of the Securities Act; instead, they were purportedly offered and sold pursuant to a registration exemption under Securities Act Regulation D.

## FACTS

**Background:**

21. Earl Miller is an Indiana native who, since 2006, has made a career in real estate development and sales.

22. Starting in 2008 -- despite having no experience in the financial services industry -- Miller branched out into the world of private investment management. He

5

opened a series of entities that took in money from private investors and then used it to make investments in real estate (the "Real Estate Entities").

23. Miller marketed his investment services to prospective investors with advertisements that boasted of "double digit annual returns" and encouraged investors to invest their 401K and IRA accounts in Miller's entities. In promotional materials, Miller claimed that his Real Estate Entities owned more than $60 million in real estate and had over 300 private investors.

24. Starting in July 2014, Miller took sole ownership in 5 Star Commercial, which he had managed since 2012, and in February 2015 created 5 Star Capital to further his efforts to solicit funds from individual investors and add to his stable of private investment vehicles.

**Miller's Fundraising for 5 Star Commercial and 5 Star Capital**:

25. Miller encouraged people who trusted him to invest their money with 5 Star Commercial and 5 Star Capital. Many of Miller's investors are financial novices. In addition, Miller has been very successful at gaining the trust of – and recruiting investors from – the local Amish community. He has advertised his investment services in local Amish newspapers, has touted his Amish heritage, and has arranged community meetings with local Amish families to discuss his investment "opportunities."

26. From at least July 29, 2014 to date, Miller raised at least $3.9 million from at least 70 investors in 5 Star Capital and 5 Star Commercial. Miller convinced some of his victims to invest their retirement funds or a majority of their life savings with those entities.

27. Investments in 5 Star Commercial and 5 Star Capital were solicited and obtained through the instrumentalities of interstate commerce. Investors came from at least

6

7 states and sent their investments to Miller through a variety of means, including wire transfer and the U.S. Mail. Miller communicated to investors through a variety of means including the telephone.

28. In exchange for their investments, Miller, 5 Star Commercial and 5 Star Capital gave investors a promissory note with a fixed-rate of return ranging from 8% to 12% per year and paid monthly – far in excess of then-prevailing rates for bank deposits, CDs and other fixed-return investment vehicles.

29. All of the investment interests in 5 Star Commercial and 5 Star Capital– offered and sold by Miller – are "securities" as that term is defined in Exchange Act Section 3(a)(10) [15 U.S.C. § 78c(a)(10)] and Securities Act Section 2(a)(1) [15 U.S.C. § 77b(a)(1)].

**Miller's Fraudulent 5 Star Commercial Offering**:

30. Beginning in 2012, Miller was the manager of 5 Star Commercial and began raising funds for investments through 5 Star Commercial.

31. Starting in July 2014, Miller gained sole control of 5 Star Commercial, and continued raising money for purported real estate investments. After July 2014, 5 Star Commercial issued promissory notes to investors and was supposed to use the proceeds from the notes to invest in residential and commercial real estate.

32. From at least July 29, 2014 until the present, Miller and 5 Star Commercial raised approximately $2.2 million from at least 44 investors in 6 states.

33. To recruit investors, Miller, on behalf of 5 Star Commercial, made oral representations to investors and also gave prospective investors written marketing materials relating to the company, including a Private Placement Memorandum ("PPM").

7

34. Since July 2014, Miller was the sole manager and owner of 5 Star Commercial and he had ultimate authority over all statements made in the 5 Star Commercial PPM. On information and belief, Miller, at least, reviewed and approved the contents of the PPM before distributing it to investors. Miller's name was on the front page of the PPM and he signed the promissory notes issued to 5 Star Commercial investors.

35. The 5 Star Commercial PPM contained multiple misrepresentations about his compensation and use of funds.

36. First, in the PPM, Miller and 5 Star Commercial represented that – although he would manage the company's operations and investments – Miller "shall not be paid a salary or wages of any type by the Company." The PPM defined "The Company" as 5 Star Commercial.

37. The representation regarding Miller's compensation was false when made. In reality, Miller took payments of at least $365,435 from 5 Star Commercial between July 29, 2014 and July 1, 2015.

38. Second, 5 Star Commercial and Miller also misrepresented and/or omitted to state the true use of investor funds. Neither 5 Star Commercial nor Miller disclosed that between July 29, 2014 and June 26, 2015, Miller used an additional $651,265 of 5 Star Commercial's assets to pay his personal debt to a former business partner.

39. Third, 5 Star Commercial and Miller represented throughout the PPM that investor funds would be used for the purchase and/or development of residential and commercial real estate. In reality, approximately $391,000 of investor funds were transferred to – used to make highly risky investments in – small, developmental stage companies that purportedly manufacture and sell "green products" such as energy efficient wash machines.

8

These are the same investments made on behalf of Miller's separate investment fund, 5 Star Capital, described below. But, unlike the prospectus for 5 Star Capital, the 5 Star Commercial prospectus does not mention that – rather than investing in real estate – investors would be investing some of their principal with fledgling "green product" companies.

40.  As described in more detail below, Miller's "green product" investments were made without even the most basic due diligence and the vast majority of those investments have defaulted in a short period of time.

41.  The misrepresentations and omissions identified in Paragraphs 21 through 40 were material. In making an investment decision, a reasonable investor would consider it important that -- contrary to the PPM -- Miller was not working for free. Rather, Miller used over $1 million from 5 Star Commercial for his own personal benefit. In addition, investors would find it important that over $650,000 of the funds Miller misappropriated was used to pay off a former business partner who as of July 29, 2014, had no role with 5 Star Commercial.

42.  In addition, in making their investment decisions, reasonable investors would consider it important that a portion of their investment was not used as represented (*i.e.*, to purchase and develop real estate), but rather was being transferred to or invested in, at best, speculative "green product" ventures.

43.  In making the material misrepresentations to investors in 5 Star Commercial identified in paragraphs 21 through 40, Miller and 5 Star Commercial acted with scienter. At the time he made the misrepresentations, Miller knew – or recklessly disregarded – that:

9

(a) Contrary to the PPM, Miller took over $365,435 from an account in 5 Star Commercial's name – an account over which Miller had sole signatory authority – and transferred it to his own personal account;

(b) After July 29, 2014, he took an additional $645,816 out of the same 5 Star Commercial account that he controlled, and used it to pay off a former business partner who had no connection to 5 Star Commercial as of July 29, 2014;

(c) Contrary to the represented investment strategy in the 5 Star Commercial PPM, he directed approximately $391,000 out of 5 Star Commercial accounts to invest in purported "green product" companies with little or no record of generating profits. Miller had sole authority over managing 5 Star Commercial's investments.

**The Fraudulent 5 Star Capital Offering**:

44. In February 2015, Miller created a new investment vehicle, 5 Star Capital. 5 Star Capital was a departure for Miller. Rather than investing in real estate, 5 Star Capital was supposed to invest its funds "into green energy saving product (sic) that save the average American consumer hundreds of dollars per year."

45. At the time of the 5 Star Capital offering, Miller was under investigation by the State of Indiana Securities Division for offering and selling unregistered securities. In April 2015, Miller entered into a consent decree and agreed to pay a $5,000 civil penalty.

46. From February 1, 2015 to the present, Miller and 5 Star Capital have raised approximately $1.6 million from at least 25 investors in three states. Prospective investors in 5 Star Capital were not told that Miller was the subject of an investigation into potential

securities law violations by the State of Indiana or that he entered a consent decree in response to charges that he violated state securities law.

47. Following the same model as 5 Star Commercial, Miller and 5 Star Capital recruited investors through oral representations and also gave prospective investors written marketing materials relating to the Fund, including a PPM.

48. Miller was the founder and sole owner of 5 Star Capital, and as such he had ultimate authority over all statements made in the 5 Star Capital PPM. On information and belief, Miller reviewed and approved the contents of the PPM before distributing them to investors. Miller's name is on the front page of the PPM and he signs the promissory notes issued to investors.

49. The 5 Star Capital PPM contained multiple misrepresentations. First, after disclosing that the fund will invest in "green products," the PPM states that "[t]he company owns patents on many of these products and will distribute them through large chain stores such as Bed Bath and Beyond."

50. The PPM also assured investors that – while their investment presented risks – 5 Star Capital (managed by Miller) "will do its best to manage these risks."

51. Miller also made oral misrepresentations to prospective investors about 5 Star Capital's use of funds. In one-on-one meetings, Miller told at least one investor in 5 Star Capital that – contrary to the 5 Star Capital PPM – their funds would be used to purchase real estate (as they had with investments in Miller's Real Estate Entities). Miller led those investors to believe that – as with the Miller's Real Estate Entities –investors would personally receive a secured interest in any purchased real estate as a guarantee of their investment.

52. The representations identified in paragraphs 44 through 51 above were false when made. First, despite 5 Star Capital's and Miller's claims, 5 Star Capital has never owned any patent for any products – let alone "green products" that will be distributed "through large chain stores such as Bed Bath and Beyond."

53. Second, contrary to the PPM's representation that Miller and 5 Star Capital would attempt to "manage risk," Miller and 5 Star Capital Fund failed to take even the most rudimentary steps necessary to vet and secure investments made on behalf of investors.

54. For example – for 5 Star Capital's primary investments – Miller directed approximately $1.1 million in investor assets to several companies controlled by two individuals, Julius Toth ("Toth") and Robert Foraker ("Foraker"). The companies run by Toth and Foraker were, at best, fledgling enterprises with little or no track record. The entities were purportedly developing products ranging from a pedal operated wheelchair to energy efficient wash machines.

55. While he purported to be "managing risk," Miller invested the overwhelming majority of 5 Star Capital's money with Toth and Foraker despite glaring red flags in their financial background. A rudimentary background search or credit report would have revealed that Toth has a past personal bankruptcy filing in 2001 that was not discharged until 2009, and that Foraker has seven previous civil judgments against him and former businesses he owned between 1996 and 2007. Miller either neglected to look into the background of Toth and Foraker or, in the alternative, knew about these red flags but recklessly invested 5 Star Capital's assets with their entities.

56. Similarly, Miller and 5 Star Capital performed virtually no due diligence on the "green" companies themselves. Miller and 5 Star Capital transferred or invested $1.1

million of investor funds despite receiving no financial statements for Toth and Foraker's entities, no detailed business plans, no sales statistics, contracts evidencing customer orders, or any other documents detailing the financial condition of the entities.

57. To make matters worse – and far from "managing risk" – Miller failed to even memorialize all of 5 Star Capital's investments in Toth and Foraker's companies. Out of the $1.1 million that 5 Star Capital invested with those companies, Miller failed to obtain a debt or equity instrument in return for $400,000 of 5 Star's Capital's investments. In short, Miller handed over $400,000 of 5 Star Capital's money and did not receive any paperwork in return evidencing, or governing the terms of, that investment.

58. Third, contrary to oral representations to certain investors, the overwhelming majority of 5 Star Capital's assets was not invested in real estate and investors did not personally receive any form of security interest securing their investments.

59. The misrepresentations identified in paragraphs 44 through 51 above were material. In making their investment decisions, reasonable investors would consider it important that:

> (a) contrary to the PPM, 5 Star Capital did not own any patents – let alone patents for "green products" poised for distribution through big-box retailers;
>
> (b) rather than taking prudent steps to "manage risk," Miller had transferred or invested at least $1.1 million of the fund's assets (i) with fledgling companies that had provided no detailed business plan or financial projections, (ii) owned by two individuals with a history of financial and legal

13

difficulties, and (iii) that, for $400,000 of 5 Star Capital's investments, failed to properly memorialize the investments.

60. In making the misrepresentations and omissions identified in paragraphs 44 through 51 above, Miller and 5 Star Capital acted with scienter. At the time he made these misrepresentations, Miller knew – or recklessly disregarded – that:

(a) He had performed no background check on Toth and Foraker before investing the majority of 5 Start Capital's assets with their companies (or, alternatively, he knew about their backgrounds and yet recklessly proceeded with the investment);

(b) He had performed virtually no due diligence into the "green product" entities before transferring or investing $1.1 million of 5 Star Capital's assets;

(c) Contrary to his representations in the 5 Star PPM, 5 Star Capital did not own any patents on any "green energy saving product"; and

(d) Contrary to oral representations made to certain investors, 5 Star Capital invested primarily in the "green product" entities rather than real estate.

**The Purported "Green Product" Investments Fail and 5 Star Capital Stops Paying Its Investors**:

61. The vast majority of 5 Star Capital's "investments" in the "green product" companies operated by Toth and Foraker failed almost as soon as they were made; the rest have not generated any return to date. Of the $1.15 million that 5 Star Commercial and 5 Star Capital transferred/invested, most of the funds were in the form of "loans" that were supposed to generate monthly interest payments. Between March 2015 and July 2015, those payments were only $3,500 per month, and then the payments stopped entirely. All of

those loans are now in default. Even when payments were being made, the investments never generated income sufficient to meet 5 Star Capital's interest obligations after March 2015.

62. As alleged in paragraphs 57 through 58 above, certain of 5 Star Capital's investments were not memorialized and the terms governing those investments are unknown. In addition, the undocumented investments have never generated any revenue.

63. In July 2015, in the wake of the failure of 5 Star Commercial and 5 Star Capital's purported investments with Toth and Foraker, 5 Star Capital stopped making interest payments that were required under the terms of the investors' promissory notes.

**Miller Invokes the Fifth Amendment in Response to Questions Posed by the SEC:**

64. On September 21, 2015, as part of its investigation into the securities law violations identified in this Complaint, the SEC issued an investigative subpoena to Miller requiring him to appear and provide testimony under oath to the SEC regarding the funds he raised from investors for, among other entities, 5 Star Capital and 5 Star Commercial.

65. On October 23, 2015, rather than appear for testimony, Miller submitted a declaration to the SEC, confirming that he was asserting his Fifth Amendment right against self-incrimination and that, on that basis, he would refuse to answer any of the SEC's questions regarding, among other topics: (a) 5 Star Capital; (b) 5 Star Commercial; (c) any representations Defendants made to investors and prospective investors; (d) Miller's awareness of any fraudulent scheme related to 5 Star Capital and 5 Star Commercial; (e) Miller's role in the creation of the PPMs, (f) Miller's receipt, misappropriation or misuse of investor assets, (g) his financial condition, (h) any underlying transactions he effected on behalf of his entities, and (i) his relationships with – and communications with – investors.

## COUNT I
### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5
**(Against Miller, 5 Star Capital, and 5 Star Commercial)**

66. Paragraphs 1 through 65 are realleged and incorporated by reference.

67. As more fully described in paragraphs 21 through 63, Defendants Miller, 5 Star Capital and 5 Star Commercial, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

68. As described in more detail in paragraphs 43 through 60 above Defendants acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

69. By reason of the foregoing, Defendants Miller, 5 Star Capital and 5 Star Commercial violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II
### Violations of Section 17(a)(1) of the Securities Act
**(Against Miller, 5 Star Capital, and 5 Star Commercial)**

70. Paragraphs 1 through 65 are realleged and incorporated by reference as though fully set forth herein.

16

71. By engaging in the conduct described in paragraphs 21 through 63 above, Defendants Miller, 5 Star Capital and 5 Star Commercial in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly, employed devices, schemes and artifices to defraud.

72. Defendants Miller, 5 Star Capital and 5 Star Commercial intentionally or recklessly engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

73. By reason of the foregoing, Defendants Miller, 5 Star Capital and 5 Star Commercial violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III
### Violations of Sections 17(a)(2) and (3) of the Securities Act
### (Against Miller, 5 Star Capital, and 5 Star Commercial)

74. Paragraphs 1 through 65 are realleged and incorporated by reference as though fully set forth herein.

75. By engaging in the conduct described in paragraphs 21 through 63 above, Defendants Miller, 5 Star Capital and 5 Star Commercial, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

   a. obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   b. engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

76. Defendants Miller, 5 Star Capital and 5 Star Commercial made the untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

17

77. By reason of the foregoing, Defendants Miller, 5 Star Capital and 5 Star Commercial have violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants Miller, 5 Star Capital and 5 Star Commercial, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Issue an Order requiring Defendants Miller, 5 Star Capital and 5 Star Commercial to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

### IV.

With regard to the Defendants' violative acts, practices and courses of business set

forth herein, issue an Order imposing upon defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other relief as this Court deems appropriate.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

*/s/Amy S. Cotter*_____
Timothy S. Leiman (LeimanT@sec.gov)
Amy S. Cotter  (CotterA@sec.gov)
Jaclyn J. Janssen  (JanssenJ@sec.gov)
SECURITIES AND EXCHANGE COMMISSION
175 West Jackson Blvd., Suite 900
Chicago, IL  60604
(312) 353-7390
(312) 353-7398 (fax)

*Attorneys for Plaintiff*